141724, Office Furnishings, Ltd. v. A.F. Crisse & Co., Ltd. Good morning. Will the attorneys who will be arguing the case please step up and introduce themselves. Good morning, Your Honors. Robert Patterson for the appellant, Office Furnishings, Ltd. Anthony Tye for A.F. Crisse & Co., Ltd. I'm sorry, could you spell your last name? T-U-N-N-E-Y. Oh, okay. Thank you. All right. Counsel, you have 20 minutes to argue. Mr. Patterson, would you like to reserve some time for rebuttal? Five minutes, Your Honor. All right. Thank you. And I have to ask a question. Is it 20 minutes total between us or each? 20 minutes each. Okay. All right. Okay. Mr. Patterson, you may begin. Thank you, Your Honor. This case comes before you on appeal from an order entering judgment NOV entered by Judge Suriano in the circuit court after a jury trial, at which both sides were able to present all the evidence they wanted to present to argue the case to the jury, and the jury made a finding in favor of the plaintiff against Mr. Werner and Crisse, the producing insurance producer. Judge Suriano took that verdict away on one issue. He said that there was no duty on an insurance producer in Illinois to talk with the client and to review the application with the client and to be sure the information submitted to the insurance company that's going to pass on whether they accept the risk. There was no duty on the producer to the client. That's completely wrong. He's mistaken. The statute, section 2201, plainly provides that there's a duty of ordinary care on an insurance producer. And then the question becomes, what did the insurance producer do to comply with that duty of ordinary care? The parties in the motions in limine addressed that question because there were questions of the judge. How far will you let the experts go? And Judge Suriano correctly ruled at that time, I will not let the expert say that there's a duty on the producer. I will let the expert say that the producer has certain obligations in performing his duties with the insurer, much like a lawyer or a doctor. The question is, you have a duty of ordinary care to your client. The next question is, did you comply with that duty or did you breach that duty? And expert witnesses come in, whether it's a legal malpractice, medical malpractice, insurance malpractice. Experts come in and say they did comply or they did not comply. In this case, Mr. McNextoe, for the plaintiff, said that Mr. Warner did not comply because he did not sufficiently review the application with his insured. The defense had an expert witness named Davis who said that he did comply, that he didn't have to do those things. And that's exactly what was discussed by the lawyers with Judge Suriano during the motion in limine phase. That's exactly what was submitted to the jury under the usual instruction for professional negligence that we all follow, 105 under the civil pattern instructions. And it specifically says, the law does not say how a reasonable, careful insurance producer would act. Let me ask you this. I agree with you relative to the statute when it says the duty is. But as far as specific coverage, specific kind of coverage, is there a different analysis on that relative to what the duty is as far as specific coverage? I don't think so. I'm not sure if Your Honor is getting to the question that counsel raised, defense raised under the Scopertis case. Maybe I am, maybe I'm not. Scopertis says that there has to be a specific request for coverage. Yes. And that's certainly true. If the producer is not asked to get coverage for the client, then of course the producer can't be responsible for not doing what they weren't asked to do. Is there an application from that case to this case? Only in that it reaffirms the general duty of ordinary care. Here there is a specific request for coverage. There was a long history between these parties whereby state mutual I think went before that and Meridian Insurance. Mr. Werner had been the producer for office furnishings for many years. And he had routinely gone about and gotten coverage on an annual basis when the previous coverage was expiring. He actually testified when Meridian said we will not renew in 2002. He testified office furnish would not have to ask me to go get coverage for them because I knew I should do that. And he did try to do that by going to certain other insurance companies. They declined. Then he called up this fellow named Coble who he knew and tried to place the coverage with Coble or with American Family through Coble. That's all perfectly proper. And it's exactly what the insurance producer should do to comply with Scopertis. And that is he has a specific request for coverage. Mr. Meyer of office furnishings would want coverage on his business and his contents. Mr. Werner went to get it from Coble and American Family. And he got a binder in late November of 2002. They were told you'll have a binder and they paid a fee for it. By December there was a meeting. And at that meeting Mr. Coble was introduced to Mr. Meyer and his assistant Ms. Johnson. Mr. Werner was present. He was present during the entirety of the meeting, although Mr. Myers was not. And he came in and went out. The application was completed. There is no factual dispute that Mr. Coble was the one who made all the entries on the application except for signatures. The representatives of office furnishings, Meyer and Johnson, testified. We did not provide the information that later on became the basis for American Family's declination of coverage for this loss. They said we did not provide the information that's on the very lower corner of the page for property insurance. It's a tiny little entry. How old is the roof?  Condition? It's blank. Professor, isn't the relationship here between the insurer and the insured, which is separate from the relationship between the producer and the person that gets insured? Well, the insurer, in this case American Family, entirely different relationship than with the insured. And what we're looking at in this case is the relationship between the insured and his producer. That's the latest word that comes from the statute, but it used to be called broker. And the agency relationship between them would have been the broker, Werner and Chrissy Company, would be the agent of the insured, and the Coble would be the agent of American Family. So what you're saying, would you say that the legal duty then for a producer is to make sure that each and every provision of that insurance contract, between two other people, two other parties, is exactly what one party wanted? No. The question that Your Honor raises, and it goes to the heart of the case, I think, and that is this. What does a producer do to comply with the duty of ordinary care? If the duty of ordinary care says that he does not have to sit with his client, the potential insured, and go through the application and try to find out for sure what do you want and what are we going to put down on these forms and so on, if the evidence is that that's not part of the activity of a producer, then the jury could find in favor of the producer and say that he complied with the standard of ordinary care. But what's your best case, Illinois case, on this counsel? It says that this specific responsibility to go through every item on an insurance contract is the duty of the producer. Yeah, I don't think there's a specific Illinois case that is that specific. There are any number of cases we've cited, the Black case, Lazara case, Perlman case, any number of cases where the producer, in those days the broker, put down the wrong address as one of them. That was an affirmative action by the producer, not just sitting back and doing nothing. They did. They didn't review that with the insured to be sure we had the right address. There's a case where the land was, the premises, it was a building, was not declared vacant. That is something that the producer, the jury held, or would hold if they got the question, would be a breach of the standard of care. So here we have, and there's another one where some babysitting went on in the household and that wasn't disclosed and so there was an exclusion for businesses conducted in the household. Any number of cases get really right to the point that producers or formerly brokers do owe a duty to the insured to be sure the application has correct information in it. One way to do it is to sit with the insured and go through it. Our expert, Mr. Nectow, said yes, that is what a reasonably qualified insurance producer should do. Mr. Patterson, was that the standard of, you know, was that the pattern of conduct that the two parties always had in the past, their history? In fact, what they did in the past was that Mr. Werner would submit the accord form. They didn't use applications with these other companies. It's called an accord form and it's a form of application. And what he did was send that in himself without going back to the insured to be sure that all the information was correct. But in those situations then, if he did that with the knowledge and consent and authority of the client, of office furnishings, isn't there sort of this implied assumption of duty in that case, whereas it's not the same situation on this replacement coverage? Well, there's two reasons why it's different. One is this is a specific application that is different than the former accord application. He actually had submitted the accord application to American Family and that's what resulted in the binder. But then he knew from Coble and he told Mr. Myers we have to have this meeting because they have a more extensive application that we have to go through and Coble may ask you questions and so forth. The fact is that there's evidence from which the jury found that, presumably found because they found from the plaintiff, that Ray Myers and Judy Johnson were not responsible for those erroneous entries and there's evidence that Mr. Werner did not know, and I have to say this, did not know the roof was five years or ten years old so he probably didn't be responsible for those entries themselves. What he is responsible for, and so it's probably Coble who put that information down, but the jury did find that the producer here, Mr. Werner, did not fulfill his duty to his client to review these pieces of information with the client to be sure they're accurate. On the defense side, of course, they had Mr. Davis and Mr. Davis says no. It's not part of the producer's obligation to review this information with the insured. The jury had a fact question to decide. They had two experts, typical situation in a professional negligence case. Fact question to decide, do we agree with Mr. Nectow that the insurance producer, under the evidence that he produced in his testimony, should have talked to the insured about these entries or do we believe, Mr. Davis, that that is not the pattern of conduct, that is not the acts that a reasonably competent insurance producer would do, in which case they would find for the defendant. That was a legal determination, was it not, the duty? No, well, Judge Suriano said in the post-trial motion there's no duty, but it's an incorrect view of what duty is just to say there's no duty to sit with your client and go through the application. That is the conflation that the Marshall Court talks about, getting fact specific about do they have a duty to sit with the client? Do they have a duty to post it in the mail or deliver it by hand? Do they have a duty to do any number of other things? Just like as a lawyer, I'm hired in an injury case. I have a duty to do all the things that a reasonably competent lawyer would do. Do I have a duty to take depositions? Do I have a duty to file a lawsuit in time? Do I have a duty to answer interrogatories correctly? The cases don't say that. The cases say you have a duty to exercise reasonable care as a lawyer. And then the experts come in and they say what does a reasonably competent lawyer do? Same with medical cases. Is there a case that says a doctor in a fracture has a duty to take an x-ray? No. There are cases that say the doctor has a duty to the patient to exercise reasonable care of a physician under the circumstances. Circumstances vary. And so if the experts say yes, he should have taken the x-ray, other experts say no, didn't have to take the x-ray, the jury decides. All right. Let me ask you this, counsel. I know there's a general duty of care, but what specific, what cases have said, like is there a duty to advise? Is there a duty to read? I mean, are there any cases that are more specific? There are a number of cases that there's a duty to advise the client about the consequences of the application. And I don't know that I can pull them out for you at the moment, but I have a list of them here. But there are cases where I think Lazaro was one, it's a federal case, where there's a duty to advise the client. And, again, that's still a specific. There is no duty to advise. Like IEC versus Glendale Insurance? IEC is very, very different. And the defense relies very heavily on it. And it's extremely distinguishable. The reason is this. The issue was whether or not the insured had gotten flood coverage or should have gotten flood coverage in addition to the sewer backup coverage that the broker did obtain for him. He actually rejected the flood coverage before. The case was first tried in the federal court against the insurance company, and the claimant received a $1.1 million verdict for wrongfully denying coverage because the backup, the damage by water, was due to sewer as well as flood. Now, the IEC case had nothing to do with whether or not the broker should have gotten other coverage because the insured had rejected flood coverage when it was discussed. So the question then became the interpretation of surface water versus sewer backup and so on, which had been dealt with in the federal court. And so IEC really doesn't stand for any proposition that bears on the outcome of this case. In fact, the plaintiff recovered there. But the point I would like to make from that case is this. The court says there was no standard of care evidence presented as to what a reasonable broker would do. So the plaintiff in the case in the Illinois state court system did not bring an expert witness and did not make evidence of what a reasonably careful producer would do, which is what Instruction 105 requires the plaintiff to do. You can only, the instruction says, you can only decide the case based on the testimony of experts because you as jurors can't be experts. And so we brought the expert. We brought Mr. Nectow. He testified to what the reasonably careful producer would do, and the jury agreed with him and said we're fine for the plaintiff. Mr. Patterson, you've used your allotted time. Thank you. Could you wrap up? Any other last comments you might have? I think one remark. Mr. Davis grudgingly in cross-examination admitted I would agree that there is a duty to review the application. And it's in the briefs. It's at volume 5, page 12. Thank you. Mr. Tunney? Good morning, Justice. Thank you for your report. There is one big difference that hasn't been addressed here, is that Mr. Warner was not the procuring agent or producer for the American Family Insurance Policy. And Your Honor was looking for more specific case law with regard to duty, and it is in SCOPOTUS, which is the most recent Illinois Supreme Court opinion on producer duty. In SCOPOTUS, it states under Section 2-2201A, a duty to exercise ordinary care arises only after coverage is requested by the insured or post-insured. At that point, Section 2-2201 requires insurance producers to exercise or post-insured care by providing the desirable coverage or by notifying the applicant of the rejection of the risk. Mr. Warner had been AFL's insurance agent for six or seven years prior to this particular renewal, and he was always able to place their coverage with insurance companies that AF Chrissy and Company had contracts with. So he was able to procure coverage on his own on behalf of AFL. And he did so, as they mentioned previously, and for about three years prior to this renewal, that coverage was placed with Meridian. Meridian timely gave notice that it would not renew. It was not going to renew this coverage when the term ran out. And as counsel pointed out, Mr. Warner, having a long-term relationship with AFL, knew that Mr. Meyer wanted coverage, and the coverage was to be the same as the Meridian coverage. He went to each of the seven insurance companies that his agency had contracts with, and each of them rejected the coverage. You meet your duty under 2-2201 by providing the coverage or by notifying the applicant of the rejection of the risk. Mr. Warner notified AFL and Mr. Meyer that he did not have a market for their coverage and that he had to go outside of his agency to find a market. And he found a market through Mr. Kobel, who is an American family agent, and explained to Mr. Meyer that Mr. Kobel would be the agent for the American family policy. Mr. Warner could not be the agent for the American family policy. And he informed Mr. Meyer that they would have to meet with Mr. Kobel and complete an American family application. Now, in prior years, when he had a contractual relationship with the carrier where he was placing the coverage, he could simply send in an accord form. It's a much more simple application because he had a contract with that insurer. And in this case, he was not able to do that. So he submitted an accord application to Mr. Kobel. Mr. Kobel was then able to give that information through an electronic system that generated a quote from the American family for the OFL coverage. Mr. Warner informed Mr. Meyer of the quote, and Mr. Meyer said he would accept that. And that information is communicated to Mr. Kobel, who buys the coverage on behalf of OFL. Then they meet to complete the American family application. And Mr. Warner did not, and cannot, and had no authority whatsoever to take action with regard to the American family application. The evidence is clear that the accord form that Mr. Warner submitted to Mr. Kobel had no information about the roof. And Mr. Meyer and Judith Johnson of OFL and Mr. Warner all testified that Warner had no knowledge about the age of the roof. He didn't know that information. It was not required on the policies he had previously procured. It was required by American family. And the information on that application was irrelevant. And it certainly didn't come from James Warner. Not only did he not know, the evidence is undisputed that other than the signatures of Judith Johnson and Raymond Meyer, all of the handwriting on the American family application is the handwriting of Joseph Cole. He testified to that. Are you saying Mr. Warner was in a position of no duty whatsoever? That's what the Cole found. Under SCPURS, you either provide the coverage to the insurer or you inform them that you can't get the coverage. We could not get the coverage. We informed them that we could not get the coverage. We were able to introduce them to a different agent who could get the coverage. So our duty at that point when Mr. Kobel bound the coverage effective December 1 and had the meeting and took the American family application, our duty with regard to the procurement of replacement coverage didn't exist. We couldn't get replacement coverage. We introduced them to a different agent who could. And Mr. Cole and Walter took to get their coverage through American family by completing the necessary American family application in a face-to-face meeting with the two employees of NFL that were authorized to act on their behalf with regard to insurance, Raymond Meyer and Judith Johnson. So what do we call Mr. Warner's position in this whole thing? Well, he is an insurance producer licensed in the state of Illinois. He's had a relationship with this client for seven years. And he, in order to help them get coverage for their business, directed them to an agent who procured the coverage at issue. So he's not the agent who procured the coverage. That's clear. He did not include or procure the replacement coverage. He did not include or fill out the application that contained erroneous information that led to American family's rescission. But he got American family involved somehow. He introduced, he contacted Mr. Kobel, who was outside of the air friction company, and asked if Mr. Kobel could place this risk and informed him that he could not place the risk. And Mr. Kobel requested information from Mr. Warner. We sent him the accord application, which he used to get a quote from American family, which quote was accepted by Mr. Meyer, and that triggered the events where the American family application was completed. So with regard to the procurement of the policy in question, Mr. Warner didn't owe any duty. He wasn't the procuring agent. He still had a relationship with OFL. After the placement of this policy, Mr. Meyer called Mr. Warner and said there was an error, that Griffin Properties, another entity that actually owned the property, OFL rented it, but they were all controlled by Mr. Meyer. And Mr. Warner, on behalf of OFL, called Mr. Kobel and told him of the error. Griffin Properties was on the accord application that Warner sent to Kobel. It was not on the policy as issued, so he contacted Kobel. He can't do a thing with that American family policy. He called Kobel on behalf of OFL and said, you were supposed to put Griffin Properties as a name and share in that policy also. And they did so. Warner did not owe any duty to OFL after advising them that they did not have an insurance company for their expiring meridian coverage. And he introduced them to the American family agent who did have a market, and a policy was issued. And the policy that was issued contained all of the coverages that had been in place in the previously expiring meridian policy, and that information came from the public adjuster retained by OFL after the loss, who said the American family policy contained all the coverages necessary to respond to this claim, both in terms of scope of coverage and in terms of limits. Counsel, let me go off topic for a minute. I'm sorry. Let's say for some reason we believe there was duty here, and counsel tries to distinguish your IEC Glenview insurance case by saying that that case, which says that there is no duty to advise customers by an insurance broker, that this case is different because this case had experts as far as testimony is involved versus the Glenview case. In this case, the IEC case is on point with regard to the duty of an insurance producer to explain the terms and conditions of an insurance policy. In IEC, the trial court, the question before the jury in IEC was whether the agent had a duty to explain to the insurer how the surface water exclusion contained in the policy, the flood exclusion, could negate the backup of sewer coverage, and there was language in that policy. And the court said, no, you don't have an obligation to explain the terms and conditions of a policy that you procured that met the requirements of the insurer. So you complied by getting the coverage that was requested. In this case, it clearly got the coverage that was requested. But what they are suggesting is that we fail to explain to OFL the meaning of the attestation clause of the application that states that you must give truthful answers, that if you don't give truthful answers, they can come back and negate your coverage. The attestation clause is clear and simple. I affirm and attest that the information contained herein above is true on average  And there are multiple attestation signatures on that application by Judith Johnson and Raymond Meyer. And once again, James Warren was not the agent taking that application. But do you really have a duty to explain to somebody that when you sign your name and attest that the things on there are true, that if they're not, I should warn you that if they're not true, they can come back and bite you? I think that's pretty clear to a business person. I don't think you need to have that explained. The thrust of their argument is that we have to be the guarantor of the truth of an application that we aren't preparing and that we aren't submitting for coverage. Here's the big distinction that is, to me, very large in this case. Every case that plaintiff's counsel cited to you, the defendant was the procuring agent. The defendant was the agent who procured the policy that had a defect. He procured the policy that had a wrong address in one situation. He procured a policy that didn't have a vacancy endorsement when there was evidence that he knew that the building was going to be vacant during a rehab project. There's never a case, I've never seen a case in this case, in doing research, or anywhere else, where an insurance agent or insurance producer is held liable for an error in an application that he did not take and an application that he did not submit for coverage. Basically, they're saying Mr. Warner, who found this market, an American family, and Joseph Coble, who could access that market, should have, at the end of Mr. Coble's meeting, done the same thing Mr. Coble did and go back over the 30-odd pages, or whatever number of pages of questions there are, and re-ask them and verify the truthfulness. There's no such duty that you'll find anywhere. He's not the producing agent. Did Todd Davis say that an insurance producer has a duty to review an application for accuracy before submitting it? He of course has said that when you're the submitting agent. If I'm taking an application from an individual for a homeowner's policy, and I say how old is your furnace, and they say three years old, and then there's a furnace explosion that causes a fire and the house is destroyed, and they find out the furnace was 30 years old, well, the agent doesn't have a duty to go over to that house into the basement and check the labels on the furnace to see whether it was manufactured. You have the right to accept the truthfulness of the information from your customer and submit it. If you submit wrong information on an application and you sign them into it and say this is true and accurate information, that rests with you. It doesn't. Maybe if the insurance agent knew or should have known, the writing and submitting agent knew or should have known that it's not true, that agent can be held liable. If he knew the building was going to be vacant because you told me it's going to be under rehab for six months, then we need to get a vacancy endorsement. If you tell me the roof is five years old, and it's not, and Mr. Meier occupied the building for over ten years and he knew there was no roof replacement during that period of time, and the insurance company comes back after a loss and says, this roof was not only more than five years old, it was previously damaged, and you had three estimates for replacement in the two or three years prior to the loss. None of that was known to James Warren, nor could it be. If he had reviewed the application, if it says five years, he wouldn't know if it was or it wasn't. And there's no evidence that he knew, none whatsoever. And I don't think that the public policy of Illinois can countenance a situation where an insurance applicant can make materialist representations in the application and have his coverage denied and then turn to his agency and say, gee, you should have told me. I'm not going to be responsible for this loss. That should be you. So the situation here, we were motioned and eliminated by Mr. McDonough's testimony on the theory that there's no duty. And Judge Soriano, some of the transcript of the hearing is continuing, said he cannot testify to duty. Duty is a legal issue that's mine. He can testify to standard of care. What should a reasonably prudent insurance producer do in placing a policy? And he did so testify. He did not testify and say this is the duty. We had a motion for direct evidence and argued no duty. The one who isn't the person here who had the duty to get the coverage, it was Colville, an American family. We brought them to the table because we couldn't get them the coverage they asked for, which is what Scoperta says you have to do. You provide the coverage or tell them that you can't get it. We couldn't provide the coverage. We told them we couldn't get the coverage. And we introduced them in the marketplace to someone who could. Our direct verdict motion was denied. Once our direct verdict motion on duty was denied, then the standard of care instruction, 105.01, was the appropriate instruction because Judge Soriano lost standard of care testimony. After the jury returned its verdict, we filed our post-trial motion seeking Judge Majoreau to leave. And after argument, Judge Soriano said, no, this Mr. Warner is not the person who owes the duty. He doesn't have the duty after he's introduced to Mr. Colville and Mr. Colville is taking an application. It's not his duty to go back and re-read the application and to verify its veracity. It clearly is not his duty. And it would be, well, I think it would be against public policy to put that duty on an insurance producer. The cases we cited, insurance companies don't have that obligation. There's no obligation on an insurance carrier to verify the information on an application. They can accept it as true. And that would be like saying insurance company A is issuing a policy, and Meridian, whose insurance company B is getting out, they have some obligation or duty. Our representation of OFL with regard to the procurement of replacement coverage ended when we couldn't get it. And when Mr. Colville stepped up and said he could, and we informed Mr. Meyer, and Mr. Meyer, the record is clear, Mr. Meyer really understood that with regard to the American family policy, Joseph Colville is the agent. Because you just can't represent a company that you don't have authority to do so. James Warner had no authority to buy the American family coverage. He had no authority to complete an American family application. He had no authority to make changes or endorsements to any American family policy. And the duty to procure the American family coverage rested solely with Joseph Colville. The loss occurred in January of 03, January 31, 03. The policy incepted December 102, so 60 days after the inception of the policy, the loss occurred. American family adjusted the loss. James Warner had nothing to do with the claims investigation. American family took a statement under oath from Mr. Meyer. American family investigated all issues besides the age of the roof. American family in their denial letter in the testimony of Donna Jones at trial was that it wasn't just the application that caused the denial. It was denial also because of misrepresentations in the claims process and in the statement under oath. We had nothing to do with that. We weren't a party to that. We didn't have a carrier in that thing. We just were not participants in that discussion. Mr. Tunney, I'm sorry. Just as a point of clarification, in your briefs you talk about the fact that Warner and the insurance agency did satisfy the duty to procure replacement policy. And you're explaining now that they had no duty under the statute to be the procuring producer. I just want to make sure I understand what it is that you're distinguishing. What we did is that when we could not procure the policy directly is that we, on behalf of OFL, introduced them to an agency. That's what you did. You introduced. You didn't procure. We introduced them. I understand. And the policy that was issued by American Family met the requirements of matching the expiring meridian coverage and was adequate in all terms to respond to the loss that occurred on January 31, 2003, but for American Family's determination that the information on the application was inaccurate and that the information submitted during the claims process and the statement under oath was also. So I'm just trying to make sure there is either a, you know, there's not, you can't just satisfy part of a duty. You have a duty and you either satisfy it or you don't. But you can't kind of cherry pick what parts of the duty. So you either had, I mean, I'm sorry, Warner and AFPC either had the duty to procure replacement  I think I would refer back to this quote that I made that when you get the request, the insurance producer fulfills his duty by either providing the desirable coverage or notifying the applicant of the rejection of the risk. So we met our duty by saying we can't get it, but we introduced him to someone who could. Okay. Okay. Thank you. Do you have any other comments? Did the judge set any other questions? Let me see if I have one other item here. If anyone has a question, I'd be happy to respond. All right. Just the cases that, if you were to read the application before, sign it does not relieve the signer of the legal consequences of its contents, including the signer's affirmation that all statements thereon are accurate and complete, as both Myers and Johnson attested on the American Family application. The citation came from page 20 of our brief, Small v. Pudencia. The attestation clause is important in this analysis as well. Thank you very much. Thank you. Mr. Patterson. Five minutes for rebuttal. Thank you. Your Honor's question goes right to one of the distinguishing features of this case. Are they the procuring agent? They did not raise a fact question to be presented to the jury or a special interrogatory as to whether Mr. Werner was a procuring agent. They always agreed he was the procuring agent, and they did go out and procure, and they said so in their briefs, as Your Honor observes, they did go out and procure by contacting Coble and American Family and getting that coverage. They charged a fee for doing it, $5,000 or $6,000, part of which Judy Johnson had paid already. Werner didn't walk away from this client. Werner continued to negotiate with American Family because the policy as it came out did not have Braithen, the owner of the property that has the insurable interest, did not have Braithen as a named insured. That was wrong, and so Mr. Werner went back to American Family through Coble to try to get that corrected. And what did he say in a writing letter to Ray Myers in March? I am working with Joe Coble to get this straightened out. He did something else. The premium structure was wrong. And so he continued to work with Coble and American Family to get the premium structure corrected. And he said that I remained the agent or producer for office furnishings all through this time frame, this scenario. Why did he do that? Because he believed he was, and he was. The fact is he was their producer, and he acknowledged that. So we can't get away from the evidence at the trial.  Maybe he wanted to present different issues for the jury to find as to whether or not he was a producer or not a producer, but the evidence is unrebutted, admitted that he remained the producer all during this scenario. Can you have a producer for the insured as well as a producer for the company? Sure. The old scenario would have been the insured has their broker, that's their agent, and the company has their agent who sells the policy, and you have two agents, one for the insured, one for the company. And that's why the cases that talk about the obligation of the company and the insured to the company differ from the cases that talk about the obligation between the insured and his own agent, because the company is adverse. The company cannot be the agent of the insured, because that's the other party in the lawsuit. And I learned that in the Krauss case that is cited to you, where the broker was the fault, had done things wrong, and was the agent of the insured, and so the insured would have had to blame the broker and not the company. And counsel tells you when he says, his quote was, of course, for Mr. Davis, of course there is a duty when you are the procuring agent. In this case, Werner remained the procuring agent all through this scenario, and he got paid for it. And they didn't ask the jury to say otherwise. So on the record that was before Judge Suriano, the duty question, there is a duty, no question is a duty. There is no question there is a specific request to get coverage. They tried to do that. They went to Coble and American Family to get coverage. They didn't do what Mr. Nectar says the standard of care would call for, to review the application and to make sure that the entries are correct. That's a question of fact. The jury found for the plaintiff, and that should be affirmed. Thank you. Thank you. I want to thank both sides of the council for preparing the briefs and being prepared for oral arguments. The court will take the matter under advisement. Thank you. Thank you.